**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

NATIONAL ASSOCIATION OF
OPTOMETRISTS & OPTICIANS;
LENSCRAFTERS, INC.; EYE CARE
CENTERS OF AMERICA, INC.,
　　　　　　*Plaintiffs-Appellants,*

　　　　　v.

KAMALA D. HARRIS, Attorney
General; DENISE BROWN, Case
Manager, in his official capacity
as Director of the Department of
Consumer Affairs,
　　　　　　*Defendants-Appellees.*

No. 10-16233

D.C. No.
2:02-cv-01464-
LKK-DAD

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted
January 23, 2012—Pasadena, California

Filed June 13, 2012

Before: Procter Hug, Jr., Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Hug

**COUNSEL**

Lois A. Schechter, Morrison & Foerster LLP, San Francisco, California, Deanne E. Maynard, Morrison & Foerster LLP, Washington, D.C., for the appellants.

Sherry L. Ledakis, Deputy Attorney General, San Diego, California, for the appellees.

**OPINION**

HUG, Senior Circuit Judge:

## I.   INTRODUCTION

This case concerns the constitutionality of certain California statutes and regulations. These statutes and regulations prohibit licensed opticians[1] from offering prescription eye-

---

[1]Individuals and optical companies, such as LensCrafters, Inc., that fill prescriptions and perform related services in selling eyewear, fit within the

wear at the same location in which eye examinations are provided and from advertising that eyewear and eye examinations are available in the same location. The National Association of Optometrists and Opticians, LensCrafters, Inc., and Eye Care Centers of America, Inc. (collectively "Plaintiffs") maintain that these California statutes and regulations violate the dormant Commerce Clause.[2] On remand from this Court, Plaintiffs filed a motion for summary judgment, contending that the statutes and regulations place a burden on interstate commerce that excessively outweighs the local benefits of the law. California's Attorney General and Department of Consumer Affairs (collectively "the State") filed a cross-motion for summary judgment. The district court denied Plaintiffs' motion for summary judgment and granted the State's motion for summary judgment. Plaintiffs timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed a complaint alleging that California's Business & Professions Code sections 655, 2556 and 3103, and two companion regulations, 16 Cal. Code of Regs, Title 16 sections 1399.251 and 1514 (collectively "challenged laws") violate the dormant Commerce Clause. Plaintiffs challenge these laws to the extent they prohibit opticians and optical companies from offering prescription eyewear at the same location in which eye examinations are provided and from advertising that eyewear and eye examinations are available in the same location. Section 655 prohibits opticians and opti-

definition of "dispensing opticians" under California law. *See* Cal. Bus. & Prof. Code § 2550. We will refer to these "dispensing opticians" simply as "opticians" or "optical companies" in this opinion.

[2]LenCrafters, Inc. is incorporated in Ohio and owns and operates retail stores in California. Eye Care Centers of America, Inc. is a Texas corporation that owns and operates retail stores in California. These California stores employ opticians and sell eyewear.

cal companies from having "any membership, proprietary interest, co-ownership, landlord-tenant relationship, or any profitsharing arrangement in any form, directly or indirectly" with ophthalmologists or optometrists.[3] Cal. Bus. & Prof. Code § 655. Section 2556 prohibits optical companies from furnishing, employing, or maintaining optometrists and ophthalmologists on their premises. Cal. Bus. & Prof. Code § 2556. In addition, opticians may not advertise the services of optometrists or ophthalmologists. Cal. Bus. & Prof. Code § 3103; Cal. Code Regs. tit. 16, §§ 1399.251, 1514.

Plaintiffs challenged these California laws primarily because optometrists and ophthalmologists may set up a practice where patients may receive both eye examinations and prescription eyewear, but opticians may offer only the sale of eyewear, not eye examinations, and therefore are unable to offer the convenience of "one-stop shopping" in California. The restrictions on one-stop shopping apply to all opticians and optical companies when they sell eyewear in California, regardless of whether their stores are entirely owned by California entities or are owned by companies incorporated outside of California.

Plaintiffs moved for summary judgment, and the State opposed the motion. The district court granted Plaintiffs' motion for summary judgment on the grounds that the challenged laws discriminate against interstate commerce and that the State failed to provide sufficient evidence that there are no other means to address its legitimate interest in protecting public health. *Nat'l Ass'n of Optometrists & Opticians v. Lockyer,* 463 F. Supp. 2d 1116 (E.D. Cal. 2006). The State appealed.

---

[3]Optometrists and ophthalmologists are health care providers who have met specified educational requirements and must comply with certain ethical and professional responsibilities. *See Nat'l Ass'n of Optometrists & Opticians v. Brown,* 567 F.3d 521, 526-27 (9th Cir. 2009). Many optometrists and ophthalmologists sell eyewear to their patients. *Id.* at 527.

We reversed, holding that the challenged laws were not discriminatory on their face, in their purpose, or in their effect.[4] *See Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 524-28 (9th Cir. 2009). Although we concluded that the challenged laws were not discriminatory, we recognized that this holding was not necessarily the end of the dormant Commerce Clause analysis and remanded to the district court to determine whether the challenged laws violate the dormant Commerce Clause even though they are not discriminatory. *Id.* at 528.

On remand, the parties filed cross-motions for summary judgment. The district court denied Plaintiffs' motion for summary judgment and granted the State's motion for summary judgment. *Nat'l Ass'n of Optometrists & Opticians v. Brown,* 709 F. Supp. 2d 968 (E.D. Cal. 2010). The court effectively concluded that, based on the facts and the law, there were no genuine issues of material fact. Plaintiffs argued that the challenged laws impermissibly burdened interstate commerce because: 1) the challenged laws preclude an interstate company from offering one-stop shopping, which is the dominant form of eyewear retailing; and 2) interstate firms would incur a great financial loss as a result of the challenged laws. *Id.* at 974-78. The district court concluded that it need not consider the evidence supporting these theories because both theories failed as a matter of law. *Id.* In reaching this conclusion, the court reasoned that, because there was no cognizable burden on interstate commerce, it need not attempt to balance the "non-burden" against the putative local interests under the test derived from *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). *Id.* at 975. Plaintiffs timely appealed, and that appeal is now before us.

---

[4]In our opinion, we concluded that these laws are "designed to prevent health care providers from being unduly affected by commercial interests." 567 F.3d at 526. We did not reach the issue of whether these laws were successful in achieving the State's goals.

## III.   STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). Therefore, our review is governed by the same standard used by the district court under Federal Rule of Civil Procedure 56(a). *Id.* Rule 56(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We may affirm a grant of summary judgment on any ground supported by the record. *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 956 (9th Cir. 2009).

## IV.   ANALYSIS

### A.   The Dormant Commerce Clause and *Pike*

[1] An understanding of *Pike* and of the purpose and scope of the dormant Commerce Clause informs our determination of whether, as a matter of law, Plaintiffs have provided sufficient evidence of a violation of the dormant Commerce Clause. "Although the Commerce Clause is by its text an affirmative grant of power to Congress to regulate interstate and foreign commerce, the Clause has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." *South-Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984); *see also Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994) ("Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate

against or burden the interstate flow of articles of commerce."). This limitation on state power has come to be known as the dormant Commerce Clause. *See Dep't of Revenue v. Davis*, 553 U.S. 328, 337 (2008).

Modern dormant Commerce Clause jurisprudence primarily "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 337-38 (internal quotation marks and citations omitted). "The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987). "The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism," because these are the "laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390 (1994). Thus, a corollary concern of the dormant Commerce Clause is that "this Nation is a common market in which state lines cannot be made barriers to the free flow of both raw materials and finished goods." *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 803 (1976).

**[2]** Given the purposes of the dormant Commerce Clause, it is not surprising that a state regulation does not become vulnerable to invalidation under the dormant Commerce Clause merely because it affects interstate commerce. *See S. Pac. Co. v. State of Ariz.,* 325 U.S. 761, 767 (1945). A critical requirement for proving a violation of the dormant Commerce Clause is that there must be a *substantial burden* on *interstate commerce. See South-Central Timber Dev.*, 467 U.S. at 87. Most regulations that run afoul of the dormant Commerce Clause do so because of discrimination, but in a small number of dormant Commerce Clause cases courts also have invalidated statutes that imposed other significant burdens on interstate commerce. *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997). These other significant burdens on interstate

commerce generally result from inconsistent regulation of activities that are inherently national or require a uniform system of regulation. *Id.*; *CTS Corp.*, 481 U.S. at 88; *see also Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 128 (1978) (recognizing that, on rare occasions, the Supreme Court has held that the Commerce Clause precludes state regulation in a particular field because "a lack of national uniformity would impede the flow of interstate goods"). A classic example of this type of regulation is one that imposes significant burdens on interstate transportation. *See Tracy*, 519 U.S. at 298 n.12; *CTS Corp.*, 481 U.S. at 88.

Although dormant Commerce Clause jurisprudence protects against burdens on interstate commerce, it also respects federalism by protecting local autonomy. *Davis*, 553 U.S. at 338. Thus, the Supreme Court has recognized that "under our constitutional scheme the States retain broad power to legislate protection for their citizens in matters of local concern such as public health" and has held that "not every exercise of local power is invalid merely because it affects in some way the flow of commerce between the States." *Great Atl. & Pac. Tea Co. v. Cottrell,* 424 U.S. 366, 371 (1976) (internal quotations and citations omitted); *see also Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 443-44 (1960) (recognizing that the Constitution "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country"); *H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949) (noting that the Supreme Court generally has supported the rights of states to "impose even burdensome regulations in the interest of local health and safety").

In a long line of dormant Commerce Clause cases, the Supreme Court has sought to reconcile these competing interests of local autonomy and burdens on interstate commerce. In one of those cases, *Pike v. Bruce Church, Inc.*, the Supreme

Court set forth the following summary of dormant Commerce Clause law, stating:

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (citation omitted).

Unfortunately, the *Pike* test has not turned out to be easy to apply. As the Supreme Court has acknowledged, there is "no clear line" in Supreme Court cases between cases involving discrimination and cases subject to *Pike*'s "clearly excessive" burden test. *See Tracy*, 519 U.S. at 298 n.12. Justice Scalia has candidly observed that "once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a quagmire." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring) (internal quotation marks omitted).

Much of the confusion stems from the fact that *Pike* does not define the term "even-handedly" and combines the test for discriminatory laws with the test for non-discriminatory laws. The cases therefore are not clear or consistent in terms of when a regulation is considered discriminatory and virtually

*per se* invalid and when and how a regulation is subjected to *Pike*'s "clearly excessive" burden test.[5] In *Tracy*, the Supreme Court recognized that a number of its cases purporting to apply the *Pike* undue burden balancing test really turned on the discriminatory character of the challenged regulations. *Tracy*, 519 U.S. at 298 n.12. According to the Supreme Court, only a small number of its cases invalidating laws under the dormant Commerce Clause have involved laws that were "genuinely nondiscriminatory, in the sense that they did not impose disparate treatment on similarly situated in-state and out-of-state interests." *Id.*

**[3]** In the instant case, we previously held that the challenged laws are not discriminatory on their face, in their purpose, or in their effect. *See Nat'l Ass'n of Optometrists,* 567 F.3d at 524-28. Nevertheless, because it is possible for non-discriminatory regulations to place a significant burden on interstate commerce and thereby violate the dormant Commerce Clause, we remanded to the district court for a determination of whether the challenged laws, though non-

---

[5]In some cases, *facial* discrimination draws the line, explicitly or in application, between: 1) laws that are considered discriminatory (*e.g.* not "even-handed" in the words of *Pike*) and therefore subject to stricter scrutiny and virtual *per se* invalidity; and 2) other laws imposing a burden on interstate commerce (including laws that are discriminatory in purpose and effect), which are subject to the *Pike* "clearly excessive" burden test. *See, e.g., Great Atl. & Pac. Tea Co. v. Cottrell,* 424 U.S. 366, 375-76, 380-81 (1976) (recognizing that, although Mississippi statute did not discriminate on its face, by its terms the statute's *effect* was to exclude Louisiana milk from Mississippi, and that such a burden on interstate commerce was clearly excessive in relation to the putative local benefits and could not be justified by protectionist goals); *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir. 1991). In other cases, the determination of whether a law is subject to strict scrutiny depends on whether there is any kind of discrimination, including facial discrimination, discriminatory purpose, and discriminatory effect. *See, e.g., Nat'l Ass'n of Optometrists & Opticians v. Brown,* 567 F.3d 521, 524-25 (9th Cir. 2009); *LensCrafters, Inc. v. Robinson*, 403 F.3d 798, 802 (6th Cir. 2005); *see also W. Lynn Creamery*, 512 U.S. at 193-96, 201-02 (holding that statute was clearly unconstitutional because of its discriminatory purpose and effect).

discriminatory, nevertheless violate the dormant Commerce Clause. *Id.* at 528. The threshold issue in this appeal is whether Plaintiffs have produced sufficient evidence that the challenged laws, though non-discriminatory, impose a significant burden on interstate commerce. As discussed below, we hold that Plaintiffs have not produced such evidence.

## B.    Significant Burden on Interstate Commerce

On remand, Plaintiffs argued that, under *Pike*, the challenged laws impermissibly burdened interstate commerce. *Nat'l Ass'n of Optometrists & Opticians v. Brown,* 709 F. Supp. 2d 968, 974-78 (E.D. Cal. 2010). The district court, relying in large part on *Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978), rejected those arguments. *Id.* On appeal, Plaintiffs contend that the district court misinterpreted *Exxon,* and they argue that the challenged laws impose a significant burden on interstate commerce because the restrictions on one-stop-shopping result in a transfer of market share and income from "out-of-state"[6] eyewear sellers to in-state optometrists and ophthalmologists who sell eyewear.[7]

---

[6]Plaintiffs use the term "out-of-state" in reference to their own case to refer to corporations that are incorporated out-of-state, but own stores that are located in California and are selling eyewear in California. They use the term "in-state" to refer to eyewear sellers who are located in California and selling eyewear in California, but are not owned by a company incorporated out-of-state. These terms are used differently, however, in the cases relied upon by Plaintiffs. Those cases generally use the term "out-of-state" to refer to the origin of goods and materials produced outside of the state or to refer to entities producing those goods and materials outside the state. Here, as far as the record shows, the eyewear sold by opticians is no more likely to have been produced outside of California than the eyewear sold by optometrists and ophthalmologists.

[7]To the extent Plaintiffs again raise arguments concerning alleged discriminatory costs, barriers to entry, or other discriminatory effects and discriminatory purposes, we will not revisit those issues. We already have rejected those arguments and held that the challenged laws are not discriminatory.

**[4]** In *Exxon*, the Supreme Court considered a Maryland law that prohibited petroleum producers and refiners from owning retail service stations in Maryland. *Exxon,* 437 U.S. 117. Because no petroleum products were produced or refined in Maryland, all the producers and refiners affected by the regulation were out-of-state companies. *Id.* at 123. The Supreme Court first rejected Exxon's argument that the statute was discriminatory. *Id.* at 124-25. The Court then rejected Exxon's argument that the statute, even if not discriminatory, still impermissibly burdened interstate commerce by placing all the adverse effects of the regulation on interstate companies. *Id.* at 126-27. In the course of explaining why there was not a burden on interstate commerce, the Court made it clear that the Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Id.* at 127.

**[5]** The reasoning of *Exxon* applies to the instant case. Plaintiffs want opticians to be able to offer one-stop shopping. The challenged laws regulating one-stop shopping are generally applicable regulations of a method of operating in a retail market. Under the reasoning of *Exxon*, the dormant Commerce Clause does not protect this method of operation, nor guarantee Plaintiffs their preferred method of operation, in the eyewear retail market.

Plaintiffs argue that *Exxon* does not preclude relief here because the challenged laws have the effect of shifting market share and profits from "out-of-state" entities to "in-state" ones.[8]

---

[8]Plaintiffs appear to make a related argument that the challenged laws burden interstate commerce because the elimination of one-stop shopping interferes with their ability to compete. This argument does not appear to be materially different from Plaintiffs' arguments regarding "out-of-state" market share and essentially is another way for Plaintiffs to argue that they should be able to engage in their preferred method of operation. Countless non-discriminatory regulations affect the ability of some out-of-state entities to compete, but that does not necessarily mean that those regulations

This argument is unavailing. Plaintiffs focus on some of the Supreme Court's language in *Exxon* to argue that the Supreme Court's decision in that case turned on the fact that the statute being challenged would not affect the market share of interstate refiners. In particular, Plaintiffs direct us to the Supreme Court's response to Exxon's argument that some refiners would stop selling petroleum in Maryland as a result of the Maryland statute:

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by *other interstate refiners*. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from *one interstate supplier to another*.

*Id.* at 127 (emphasis added).

Plaintiffs make much of the fact that the *Exxon* Court wrote of a shift from one "interstate supplier to another," and they argue that this explains why the Supreme Court upheld the statute. Plaintiffs distinguish their own case on the grounds that here the challenged laws will cause a shift in market share from eyewear sellers owned by companies that are

---

impose a significant burden on interstate commerce. *Cf. Exxon*, 437 U.S. at 133 ("[I]f an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed."). If we were to create an exception to *Exxon*'s rule regarding methods of operation for those cases in which competition was affected, such an exception would swallow the rule. Moreover, such an exception would be contrary to the reasoning and result in *Exxon*, where the statute unquestionably affected competition.

incorporated outside of California to entirely *in-state* eyewear sellers. It is true that, in *Exxon*, all of the shift in supply necessarily would have been from one out-of-state supplier to another because there were no in-state suppliers. In contrast, here we may assume that there will be a shift in market share from optical stores owned by companies incorporated out-of-state[9] to in-state optometrists or ophthalmologists.

**[6]** But the *Exxon* Court's own analysis shows that the fact that the change in supply would be from one interstate petroleum supplier to another interstate petroleum supplier had no bearing on the Court's decision, especially once the Court determined that the statute was not discriminatory.[10] After ruling that the Maryland statute was not discriminatory, the Court addressed the argument that the statute nevertheless burdened interstate commerce. The Court focused its concern on the free flow of petroleum into the state, not on who ultimately profited. The Court noted: "The crux of appellants' claim is that, *regardless of whether the State has interfered with the movement of goods in interstate commerce*, it has interfered with the natural functioning of the interstate market either through prohibition or through burdensome regulation."

---

[9]The restrictions on one-stop shopping apply to all opticians and optical stores, including those owned by California companies. Thus, we will assume that there also will be a transfer of eyewear sales and income from optical companies owned by Californians to California optometrists and ophthalmologists. We also understand that there are methods of operation that may impact market share to the benefit of the chain optical stores owned by interstate companies. However, for purposes of this appeal, we assume that the challenged laws will result in an overall shift in the market share of eyewear sales and profits from optical stores owned by out-of state corporations to entities that are entirely owned by Californians.

[10]Even in its statements regarding discriminatory effects, the Court was discussing the free flow of goods, not who owned those goods, stating: "[I]f the effect of a state regulation is to cause local *goods* to constitute a larger share, and *goods* with an out-of-state source to constitute a smaller share, of the total sales in the market . . . the regulation may have a discriminatory effect on interstate commerce." *Id.* at 126 n.16 (emphasis added).

*Exxon,* 437 U.S. at 127 (internal quotation marks omitted) (emphasis added). It was in the course of rejecting this argument that the Court stated: "We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market." *Id.* The Court went on to explain that the dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."[11] *Id.* at 127-28. Furthermore, the Court concluded, if the statute caused the loss of stations owned by some refiners and therefore caused harm to the consuming public, such a result would be related to the wisdom of the statute, not to a burden on interstate commerce. *Id.* at 127-28.

The *Exxon* Court determined that the challenged statute had no impact on the interstate flow of goods, pointing out that the sales by independent retailers (who necessarily obtained their petroleum products from outside Maryland) were just as much a part of the flow of interstate commerce as sales made by the stations operated by interstate refiners. *Exxon,* 437 U.S. at 126 n.16. As part of its analysis, the Court held that the case did not involve a situation in which there would be a lack of national uniformity that would impede the flow of interstate goods. *Id.* at 128. Having determined that there was no discrimination or other burden on interstate commerce, the Court

---

[11]Plaintiffs concede that there would not be a burden on interstate commerce if business shifted from one set of interstate firms to another set of interstate firms. Thus, Plaintiffs do not appear to be maintaining the argument that mere loss of profits demonstrates a burden on interstate commerce. Rather, their argument rests on the theory that the challenged laws will result in a shift in the share of sales and profits from companies that are incorporated out-of-state. To the extent Plaintiffs *are* arguing that a mere loss of profits constitutes a burden on interstate commerce, that argument has no merit. As *Exxon* makes clear, the dormant Commerce Clause does not protect a particular company's profits. *Exxon,* 437 U.S. at 127; *see also Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1013-17 (9th Cir. 1994) (holding that dormant Commerce Clause did not protect plaintiffs' economic investment against legitimate state regulations protecting native wildlife).

concluded its Commerce Clause inquiry and upheld the statute. *Id.* at 128-29, 134. Thus, in deciding whether there was a non-discriminatory burden on interstate commerce and a violation of the dormant Commerce Clause, the *Exxon* Court's decision turned on the interstate *flow of goods*, not on where the retailers were incorporated, what the out-of-state market shares of sales and profits were, or whether competition would be affected by the statute. *Exxon* thus undercuts, rather than supports, Plaintiffs' claim.

Plaintiffs next argue that *Minnesota v. Clover Leaf Creamery, Co.*, 449 U.S. 456 (1981), supports their claim that there is a significant burden on interstate commerce when non-discriminatory regulations result in *income* shifting from out-of-state corporations to in-state businesses.[12] We find this argument unconvincing. The Minnesota statute at issue in *Clover Leaf* prohibited all milk retailers in Minnesota from selling their products in plastic, non-returnable milk containers. *Id.* at 472. The likely result of the statute was that many milk retailers would switch from plastic milk containers to paperboard milk containers. *Id.*

After rejecting the argument that the statute was discriminatory,[13] the Court concluded that the controlling question was

---

[12]Plaintiffs similarly claim that *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330 (2007)*,* supports its conclusion that there is a burden on interstate commerce if income is shifted out of state, arguing that the *United Haulers* Court's "chief finding" in its *Pike* analysis was that the Court had not detected any disparate impact between in-state and out-of-state businesses. This part of *United Haulers* is of no import here because it is not the opinion of the Court, because it does not state if or why this fact had any significance, because it appears to relate to discriminatory effects, and because it made no determination of whether there even was a burden on interstate commerce. *See id.* at 346.

[13]The *Clover Leaf* Court's assessment of whether the statute was "discriminatory" did not include an analysis of whether the statute had discriminatory effects. *See Clover Leaf*, 449 U.S. at 471-72. The Court arguably was discussing discriminatory effects as part of its application of *Pike*'s "clearly excessive" burden test. *Id.* at 473-74.

whether, under *Pike*, there was a burden on interstate commerce that was clearly excessive in relationship to the putative local interests. *Id.* at 472. In its analysis of the burden on interstate commerce, the Court's discussion centered on the flow of goods and raw materials into Minnesota. The Court began by noting that the statute would permit milk to continue to move freely across the Minnesota border. *Id.* The Court nevertheless found a "relatively minor" burden on interstate commerce because the statute would result in some benefits to Minnesota's pulpwood industry at the expense of non-Minnesota industries. *Id.* at 473. This effect was due to the fact that the plastic resin used in non-returnable milk jugs was produced by non-Minnesota firms, while pulpwood was a major Minnesota product. *Id.*

Although the Supreme Court found the burden to be relatively minor and upheld the statute, Plaintiffs argue that this part of *Clover Leaf* shows that a shift in *income* from "out-of-state" to "in-state" businesses is a burden on interstate commerce that must be weighed against the benefits of a statute causing such a shift in income. In *Clover Leaf*, however, the Court made no mention of "income" and instead discussed manufacturing and exporting materials or goods into another state. The Court used terms such as "Minnesota *product*," "out-of-state *pulpwood producers*," "Minnesota pulpwood *industry*," and "out-of-state *plastics industry*," and it addressed the issue of whether there would be a change in the importation into Minnesota of materials and goods produced outside of Minnesota. *Id.* at 472-73 (emphasis added). Thus, the Court's determination of whether there was a burden on interstate commerce turned on a change in the flow of goods into the state, not on profits.

**[7]** We conclude that Supreme Court precedent[14] estab-

---

[14]In addition to *Exxon* and *Clover Leaf*, Plaintiffs cite a number of other Supreme Court cases for the proposition that, under the *Pike* test, courts consider lost profits and the transfer of revenue or market share from out-

lishes that there is not a significant burden on interstate commerce merely because a non-discriminatory[15] regulation precludes a preferred, more profitable method of operating in a retail market. Where such a regulation does not regulate activities that inherently require a uniform system of regulation and does not otherwise impair the free flow of materials

---

of-state firms to in-state firms to constitute an injury under the dormant Commerce Clause. However, these cases are discrimination cases, and they reinforce our conclusion that dormant Commerce Clause jurisprudence is concerned with burdens resulting from discrimination and interference with the interstate flow of goods, not the share of profits obtained by entities owned by interstate corporations. For example, in *West Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 196 (1994), the Supreme Court concluded that the purpose and effect of the state's thinly disguised tariff on out-of-state milk was to cause local goods to be a larger share of the market at the expense of goods coming from out-of-state. The Court determined that the statute was discriminatory and a violation of the dormant Commerce Clause. *Id.* at 194-97. Similarly, *Pike* itself is a case in which the challenged order prohibited interstate transfer of cantaloupes for packing, and the Supreme Court has indicated that the decision in *Pike* was about discrimination. *See Pike*, 397 U.S. at 138, 146 (holding that state's interest was not compelling and that Court would not permit state to require that cantaloupe grower take its packing business to a local packing company instead of to a packing company in another state); *see also Tracy*, 519 U.S. at 298 n.12 (classifying *Pike* as a case that purported to apply the *Pike* undue burden test, but turned largely on the discriminatory character of the challenged state regulations). *C&A Carbone* is yet another discrimination case that discussed concerns about the flow of goods and services. *See C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 389-90 (1994) (holding ordinance that had effect of prohibiting out-of-state businesses from providing certain waste services was discriminatory and applying strict scrutiny instead of "clearly excessive" burden test); *see also Raymond Motor Transp. Inc. v. Rice*, 434 U.S. 429, 445 (1978) (holding that Wisconsin statute barring trucks of certain lengths imposed a "substantial burden on the interstate movement of goods"); *S.D. Myers, Inc. v. City and Cnty. of San Francisco*, 253 F.3d 461, 471(9th Cir. 2001) (upholding non-discriminatory ordinance that adversely impacted plaintiff and emphasizing that the "Commerce Clause is concerned with the free flow of goods and services through the several states").

[15]By "non-discriminatory," we mean a regulation that does not discriminate on its face, in its purpose, or in its effects.

and products across state borders, there is not a significant burden on interstate commerce. We find no support in the law for Plaintiffs' proposition that there is a significant burden on interstate commerce whenever, as a result of non-discriminatory retailer regulations, there is an incidental shift in sales and profits to in-state entities from retailers that operate in-state but are owned by companies incorporated out-of-state.[16]

**[8]**  In light of this law, it is apparent that, in the case before us, there is no material issue of fact regarding whether the challenged laws place a significant burden on interstate commerce. Plaintiffs have not produced evidence that the challenged laws interfere with the flow of eyewear into California; any optician, optometrist, or ophthalmologist remains free to import eyewear originating anywhere into California and sell it there. In addition, we are not concerned here with activities that require a uniform system of regulation. Thus, Plaintiffs have failed to raise a material issue of fact concerning whether there is a significant burden on interstate commerce.

## C.  Benefits of the Challenged Laws

Relying on *Pike*, Plaintiffs argue that, in determining whether a regulation violates the dormant Commerce Clause, courts are required to examine the actual benefits of non-discriminatory regulations. However, *Pike* discusses whether

---

[16]Plaintiffs' interpretation of the law is not only incorrect, but would lead to unworkable and illogical results. If an interstate company suddenly purchased all a state's retailers that were adversely affected by that state's regulations, under Plaintiffs' interpretation of the law, a regulation that previously was constitutional might immediately be rendered unconstitutional if the regulations then had the effect of shifting profits from "out-of-state" entities to "in-state" entities. In such situations, out-of-state corporate headquarters effectively could determine the policies and laws of another state. This situation would not be consistent with the purposes of the dormant Commerce Clause.

the burden on interstate commerce is "clearly excessive in relation to the *putative* local benefits." *See Pike*, 397 U.S. at 142 (emphasis added). It does not mention actual benefits as part of the test for determining when a regulation violates the dormant Commerce Clause.

**[9]** Even if *Pike*'s "clearly excessive" burden test were concerned with weighing actual benefits rather than "putative benefits," we need not examine the benefits of the challenged laws because, as discussed above, the challenged laws do not impose a significant burden on interstate commerce. If a regulation merely has an effect on interstate commerce, but does not impose a significant burden on interstate commerce, it follows that there cannot be a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits" under *Pike*. Accordingly, where, as here, there is no discrimination and there is no significant burden on interstate commerce, we need not examine the actual or putative benefits of the challenged statutes. This is the implicit lesson of *Exxon*. Once the *Exxon* Court determined that there was no discrimination and no significant burden on interstate commerce, it ended its dormant Commerce Clause analysis without assessing the value of the statute's purported benefits or actual benefits. *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 125-29 (1978).

**[10]** Plaintiffs ask us to determine whether the benefits of the challenged laws are illusory. Occasionally, when determining whether a non-discriminatory health and safety regulation violates the dormant Commerce Clause, courts will consider evidence related to a regulation's actual benefits to determine if the purported benefits of the regulation are illusory.[17] However, the issue of whether a regulation is illusory is

---

[17]In order for a regulation to be deemed "illusory," the state must fail to make even a colorable showing that the regulations contribute to health and safety, resulting in overwhelmingly one-sided evidence that there are no real benefits to the challenged law. *See, e.g., Raymond Motor Transp.*

relevant only in very limited circumstances that are not present here. In the absence of discrimination or another substantial burden on interstate commerce, we need not determine if the benefits of a statute are illusory. *See, e.g., Raymond*, 434 U.S. at 445 (holding that regulations violated the dormant Commerce Clause where they imposed a substantial burden on the interstate movement of goods and interfered with the flow and speed of interstate truck transportation, and the state failed to make even a colorable showing that the regulations contributed to safety); *see also Kassel v. Consol. Freightways Corp. of Delaware*, 450 U.S. 662, 670-71 (1981) (plurality) (recognizing that some burdens associated with state safety regulations must be tolerated, but holding that where "the State's safety interest has been found to be illusory, and its regulations impair significantly the federal interest in efficient and safe interstate transportation," the state law violates the dormant Commerce Clause).

**[11]** Because the challenged laws are not discriminatory and do not impose a significant burden on interstate commerce, it would be inappropriate for us to determine the constitutionality of the challenged laws based on our assessment of the benefits of those laws and the State's wisdom in adopting them. *See CTS Corp.*, 481 U.S. at 92 (noting that the Supreme Court is not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation); *Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983, 984 (9th Cir. 1991) (holding that it was inappropriate for the district court to make a quasi-legislative judgment by

---

*Inc. v. Rice*, 434 U.S. 429, 437-38, 447-48 (1978). But, if the state produces some evidence showing the purported benefits exist, the challenged statute will not be considered illusory even if there is strong countervailing evidence. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987) (rejecting contention that state's concern with prospect of coercive tender offers was illusory because, even though there was support for the notion that tender offers generally should be favored, there was some evidence showing that state's concern was not groundless).

weighing community concerns about noise against the need for safe and efficient national transportation system); *cf. Davis*, 553 U.S. at 355 (recognizing that the judicial process is generally unsuited to answering many of the cost-benefit questions raised in dormant Commerce Clause challenges).

Accordingly, we express no opinion regarding the value of the putative benefits or the actual benefits of the challenged laws.

## D.   Alternatives To the Challenged Laws

Plaintiffs contend that the district court erred by failing to determine whether there is a genuine issue of material fact concerning whether the purposes of the challenged laws could be served as well with less restrictive alternatives. As an initial matter, it is not clear what role possible alternative regulations play when, as here, the challenged laws are not discriminatory. In most dormant Commerce Clause cases, it is not the role of the courts to determine the best legislative solution to a problem. *See S. Carolina State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 190 (1938) (holding that "a court is not called upon, as are state Legislatures, to determine what, in its judgment, is the most suitable restriction to be applied of those that are possible, or to choose that one which in its opinion is best adapted to all the diverse interests affected"). During the course of simultaneously discussing both discriminatory and non-discriminatory regulations, *Pike* does refer to whether a local interest "could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). However, in one of the Supreme Court's most recent discussions of the *Pike* test, the Court distinguished between discriminatory laws and non-discriminatory laws, requiring an examination of alternatives for discriminatory laws,[18] but not for other laws. *See Dep't of*

---

[18]This dichotomy is consistent with prior Supreme Court precedent. *See, e.g., Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 894

*Revenue v. Davis*, 553 U.S. 328, 338-39 (2008). This distinction is consistent with case law requiring the consideration of less restrictive alternatives only when heightened scrutiny is required.

**[12]** Even assuming that, in the wake of *Davis*, overwhelming and conclusive evidence of equally effective alternative regulations is relevant to the analysis of non-discriminatory regulations, in order for us to invalidate a statute based on the availability of less burdensome alternatives, the statute would have to impose a significant burden on interstate commerce. *See Pac. Nw. Venison Prods. v. Smitch,* 20 F.3d 1008, 1016 (9th Cir. 1994). Because the challenged laws do not impose a significant burden on interstate commerce, it would be inappropriate for us to set them aside based on a conclusion that the State's purposes could be served as well with alternative laws. We therefore will not consider any evidence regarding alternative means for the State to achieve its goals.

## V.   CONCLUSION

For the foregoing reasons, the district court's order granting the State's motion for summary judgment and denying Plaintiffs' motion for summary judgment is AFFIRMED.

---

(1988) (recognizing that a state law applying a statute of limitations only to those present in the state had the discriminatory effect of subjecting foreign and domestic corporations to different regulations, and the state could not justify the statute as a means of ensuring that foreign corporations would be liable for acts done within the state because a long-arm statute would permit service on such corporations); *Great Atl. & Pac. Tea Co v. Cottrell,* 424 U.S. 366, 375-77 (1976) (discussing obvious alternative to a Mississippi statute that had both a questionable purpose and the discriminatory effect of excluding all milk from Louisiana even if the milk met Mississippi health standards).