**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHINATOWN NEIGHBORHOOD
ASSOCIATION, a nonprofit
corporation; ASIAN AMERICANS FOR
POLITICAL ADVANCEMENT, a
political action committee,
              *Plaintiffs-Appellants*,

            v.

KAMALA HARRIS, Attorney General
of the State of California; CHARLTON
H. BONHAM, Director, California
Department of Fish and Game,
              *Defendants-Appellees*,

HUMANE SOCIETY OF THE UNITED
STATES; MONTEREY BAY AQUARIUM
FOUNDATION; ASIAN PACIFIC
AMERICAN OCEAN HARMONY
ALLIANCE,
     *Intervenor-Defendants–Appellees*.

No. 14-15781

D.C. No.
3:12-cv-03759-
WHO

OPINION

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick III, District Judge, Presiding

Argued and Submitted
March 18, 2015—San Francisco, California

Filed July 27, 2015

Before: Stephen Reinhardt, John T. Noonan,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz;
Dissent by Judge Reinhardt

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of plaintiffs' amended complaint challenging California's "Shark Fin Law," which makes it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin" in the state.

The panel rejected plaintiffs' claim that the Shark Fin Law is preempted by the Magnuson-Stevens Fishery Conservation and Management Act. The panel held that plaintiffs failed to identify any actual conflict between federal authority under the Magnuson-Stevens Act to manage shark fishing in the ocean off the California coast and the California Shark Fin Law. The panel further held that the district court did not abuse its discretion by failing

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to sua sponte grant plaintiffs leave to amend so they could plead additional facts to support the preemption claim. The panel held that even assuming that plaintiffs preserved the argument for appeal, leave to amend would be futile.

The panel rejected plaintiffs' claim that the Shark Fin Law is per se invalid under the Commerce Clause because it interferes with the interstate commerce in shark fins. The panel held that even when state law has significant extraterritorial effects, it passes Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct. The panel further determined that the Shark Fin Law does not interfere with activity that is inherently national or that requires a uniform system of regulation, and that, accordingly, there is no significant interference with interstate commerce.

Judge Reinhardt dissented in part because he believes that plaintiffs must be granted leave to amend the complaint with respect to their preemption claim.

---

## COUNSEL

Michael Tenenbaum (argued), The Michael Tenenbaum Law Firm, Santa Monica, California; Joseph M. Breall, Breall & Breall LLP, San Francisco, California, for Plaintiffs-Appellants.

Kamala D. Harris, Attorney General of California, Douglas J. Woods, Senior Assistant Attorney General, Tamar Pachter, Supervising Deputy Attorney General, Alexandra Robert Gordon (argued), Deputy Attorney General, San Francisco, California, Attorneys for Defendants-Appellees.

Bruce A. Wagman, Schiff Hardin LLP, San Francisco, California; Ralph E. Henry (argued), The Humane Society of the United States, Washington, DC, Attorneys for Intervenors-Defendants-Appellees The Humane Society of the United States, Monterey Bay Aquarium Foundation, and Asian Pacific Americans for Ocean Harmony Alliance.

Seth L. Atkinson, Natural Resources Defense Council, San Francisco, California, for Amicus Curiae Natural Resources Defense Council.

## OPINION

HURWITZ, Circuit Judge:

California's "Shark Fin Law" makes it "unlawful for any person to possess, sell, offer for sale, trade, or distribute a shark fin" in the state. Cal. Fish & Game Code § 2021(b). The plaintiffs in this action claim that the Shark Fin Law violates the Supremacy Clause by interfering with the national government's authority to manage fishing in the ocean off the California coast, and the dormant Commerce Clause by interfering with interstate commerce in shark fins. The district court dismissed the plaintiffs' amended complaint with prejudice, and we affirm.

## I.

### A.

The Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884, "was enacted to establish a federal-regional partnership to

manage fishery resources." *Nat'l Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000).   Under the MSA, the federal government exercises "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone" ("EEZ"), 16 U.S.C. § 1811(a), which extends from the seaward boundary of each coastal state to 200 miles offshore,[1] *id.* § 1802(11); *City of Charleston v. A Fisherman's Best, Inc.*, 310 F.3d 155, 160 (4th Cir. 2002).   The MSA expressly preserves the jurisdiction of the states over fishery management within their boundaries. *See* 16 U.S.C. § 1856(a)(1).

To manage fishing in the EEZ, the MSA calls for the creation of regional Fishery Management Councils ("FMCs"), composed of state and federal officials and experts appointed by the Secretary of the National Marine Fisheries Service ("NMFS").   16 U.S.C. § 1852(b)(1)-(2). With the cooperation of "the States, the fishing industry, consumer and environmental organizations, and other interested persons," *id.* § 1801(b)(5), the NMFS and FMCs develop and promulgate Fishery Management Plans ("FMPs") to "achieve and maintain, on a continuing basis, the optimum yield from each fishery," *id.* § 1801(b)(4).[2]   In

---

[1] In California, the seaward boundary is three miles offshore. *Vietnamese Fishermen Ass'n of Am. v. Cal. Dep't of Fish & Game*, 816 F. Supp. 1468, 1470 (N.D. Cal. 1993).

[2] *See, e.g.*, Fishery Management Plan for U.S. West Coast Fisheries for Highly Migratory Species, Pacific Fishery Management Council

the MSA, "optimum yield" means the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems." *Id.* § 1802(33); *see also* 50 C.F.R. § 600.310(e)(3).

## B.

Shark finning is the practice of removing the fins from a living shark. The primary market for shark fins is to make shark fin soup, a traditional Chinese dish.

Even before the Shark Fin Law was passed, federal and state law prohibited finning in the waters off the California coast. In 1995, the California legislature made it "unlawful to sell, purchase, deliver for commercial purposes, or possess on any commercial fishing vessel . . . any shark fin or shark tail or portion thereof that has been removed from the carcass." Cal. Fish & Game Code § 7704(c); *see* 1995 Cal. Legis. Serv. ch. 371, § 1 (S.B. 458). In 2000, Congress added finning prohibitions to the MSA, which, as amended in 2011, make it unlawful to remove the fins from a shark at sea, possess detached fins aboard fishing vessels, transfer them from one vessel to another, and land them onshore. *See* 16 USC § 1857(1)(P); Conservation of Sharks, Pub. L. No. 111-348, § 103(a)(1), 124 Stat. 3668, 3670 (2011); Shark Finning Prohibition Act, Pub. L. No. 106-557, § 3, 114 Stat. 2772 (2000).

---

(July 2011), *available at* http://www.pcouncil.org/wp-content/uploads/HMS-FMP-Jul11.pdf.

In 2011, after finding that shark finning nonetheless continued to "cause[] tens of millions of sharks to die each year," thereby threatening a critical element of the ocean ecosystem, and that "California is a market for shark fin" that "helps drive the practice of shark finning," 2011 Cal. Legis. Serv. ch. 524, § 1(d), (f) (A.B. 376), the California legislature passed the Shark Fin Law, which makes it a misdemeanor to possess, sell, trade, or distribute detached shark fins in California, *see* Cal. Fish & Game Code §§ 2021(b), 12000.

## C.

The plaintiffs are associations whose members previously engaged in cultural practices and commerce involving shark fins. They claim that the Shark Fin Law is preempted by the MSA because it interferes with federal management of shark fishing in the EEZ, and with the federal government's prerogative to balance the various statutory objectives of the MSA. They also claim the law runs afoul of the dormant Commerce Clause by interfering with commerce in shark fins between California and other states, and by stemming the flow of shark fins through California into the rest of the country.[3]

In August 2012, the plaintiffs moved the district court to preliminarily enjoin the enforcement of the Shark Fin Law. The district court denied the motion, and we

---

[3] The plaintiffs also claimed below that the Shark Fin Law violates the Equal Protection Clause, but they abandoned this claim at oral argument.

affirmed, agreeing that the plaintiffs had failed to show a likelihood of success on the merits of their preemption and dormant Commerce Clause claims.[4]    *See Chinatown Neighborhood Ass'n v. Brown*, 539 F. App'x 761, 762-63 (9th Cir. 2013) (mem.).    On December 9, 2013, the plaintiffs filed an amended complaint.  The district court granted the defendants' motion to dismiss with prejudice on March 24, 2014.

---

[4] The federal government raised tentative preemption concerns in an untimely amicus brief filed with this Court while the appeal from the denial of the preliminary injunction was before us.  *See Chinatown Neighborhood Ass'n v. Brown*, 539 F. App'x 761, 763 (9th Cir. 2013) (mem.).  That brief relied in part on an NMFS notice of proposed rulemaking—which proposed regulations that have not been adopted—suggesting that under certain circumstances, the MSA would preempt state laws that have the effect of regulating fishing within the EEZ. *See* Magnuson-Stevens Act Provisions; Implementation of the Shark Conservation Act of 2010, 78 Fed. Reg. 25,685, 25,687 (May 2, 2013). We declined to consider the federal government's position on preemption in determining whether the district court had abused its discretion in denying preliminary injunctive relief because that position was first presented in an untimely amicus brief on appeal, but said that the federal government could "rais[e] these arguments in the permanent injunction proceedings."  *Chinatown Neighborhood Ass'n*, 539 F. App'x at 763.  The federal government did not file an amicus brief in connection with the motion to dismiss or the present appeal, but the defendants have submitted correspondence from the NMFS stating that the Shark Fin Law "is not preempted by the Magnuson-Stevens Act, as amended."  In light of our conclusions below, we need not rely on this position.

## II.

We have jurisdiction over this appeal under 28 U.S.C. § 1291. We review a district court's grant of a motion to dismiss de novo, *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009), and the denial of leave to amend for abuse of discretion, *Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1385 (9th Cir. 1988).

## III.

The MSA does not have an express preemption provision. Even absent such a provision, however, a federal statute has preemptive effect if it conflicts with state law. This can occur when "compliance with both federal and state regulations is a physical impossibility," *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).[5] In assessing the preemptive force of a federal statute, the purpose of Congress, as "discerned from the language of the pre-emption statute and the statutory framework surrounding it," is the "ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996) (quotation marks omitted).

---

[5] Under the doctrine of "field preemption," state law is preempted if it regulates "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona*, 132 S. Ct. at 2501. The plaintiffs have abandoned any claim of field preemption.

A presumption against preemption applies generally, but is especially strong when, as here, "Congress has legislated in a field which the states have traditionally occupied." *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 674 (9th Cir. 2013); *see also Bayside Fish Flour Co. v. Gentry*, 297 U.S. 422, 426 (1936) (explaining the historic control of states over fish in state waters); *N.Y. State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1309-10 (2d Cir. 1994) ("The interest of a state in regulating the taking of its fish and wildlife resources has been long established."). Thus, the California statute cannot be set aside absent "clear evidence" of a conflict. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 885 (2000); *see also McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) ("[T]he historic police powers of the States were not to be superseded unless that was the clear and manifest purpose of Congress." (alteration omitted)).

## A.

Although the plaintiffs argue the Shark Fin Law interferes with the federal government's authority under the MSA to manage shark fishing in the EEZ, they do not identify any "actual conflict between the two schemes of regulation." *Fla. Lime*, 373 U.S. at 141. To be sure, the California statute restricts certain economically viable uses for sharks that are lawfully harvested from the EEZ and landed in California. But the MSA does not mandate that a given quantity of sharks be harvested from the EEZ—and even if it did, detached fins are not the only viable use for harvested sharks. As the plaintiffs recognize, "[t]he use of approximately 95% of any legally fished shark for shark oil, shark meat, shark skin, etc. is still permitted" under the California regime. The plaintiffs point to no "clear and manifest" intent of Congress to preempt regulation such as

the Shark Fin Law, *McClellan*, 776 F.3d at 1039; rather, they have alleged nothing more than the prospect of a "modest impediment" to general federal purposes, *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 667 (2003). This does not suffice to overcome the presumption against preemption. *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 67 (2002) (finding no preemption in the absence of conflict with an "authoritative message" from Congress); *P.R. Dep't of Consumer Affairs v. Isla Petrol. Corp.*, 485 U.S. 495, 501 (1988) (same); *Fla. Lime*, 373 U.S. at 146-52 (same).**[6]**

---

**[6]** The cases relied upon by the plaintiffs that invalidate state regulations with effects on fishing in the EEZ are unpersuasive because in each case, the invalidated regulations either directly proscribed what federal law affirmatively allowed, *see A Fisherman's Best*, 310 F.3d at 173-76 (Fourth Circuit case finding preempted a city resolution forbidding access to ports for vessels using longline tackle, which was the only fishing method authorized by the applicable FMP), or directly banned activity within the EEZ that was legal under federal law, *see Vietnamese Fishermen Ass'n*, 816 F. Supp. at 1475 (concluding an FMP permitted the use of gill nets in certain places within the EEZ, and invalidating a California proposition banning the use of gill nets in the EEZ); *Bateman v. Gardner*, 716 F. Supp. 595, 597-98 (S.D. Fla. 1989) (finding preempted a Florida statute that banned fishing in portions of the EEZ where federal law allowed it), *aff'd*, 922 F.2d 847 (11th Cir. 1990) (mem.). In *Southeast Fisheries Association v. Chiles*, a case cited in the dissent, the Eleventh Circuit suggested in dicta that state-law daily quotas on landing Spanish Mackerel would interfere with a federal annual quota on catch of that fish in the EEZ. 979 F.2d 1504, 1509-10 (11th Cir. 1992). There too, state law directly conflicted with what federal law allowed.

**B.**

The plaintiffs emphasize that even when state and federal purposes overlap, a conflict in the method of achieving those purposes can be grounds for setting aside a state law. *See Arizona*, 132 S. Ct. at 2505 ("[C]onflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy."). They discern in the MSA a balancing of competing objectives in fishery management and a corresponding congressional intent to preclude state legislation that promotes one of these objectives—conservation—over others. *See, e.g.*, *id.* (finding state law preempted from interfering "with the careful balance struck by Congress with respect to unauthorized employment" of undocumented workers).

The MSA indeed recognizes various competing values. *See* 16 U.S.C. § 1801(b) (listing "conserv[ing] and manag[ing] the fishery resources found off the coasts of the United States," "promot[ing] domestic commercial and recreational fishing under sound conservation and management principles," and "encourag[ing] the development by the United States fishing industry of fisheries which are currently underutilized or not utilized . . . in a non-wasteful manner" as objectives of the MSA). Among them, however, conservation is paramount. *See Nat. Res. Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 879 (9th Cir. 2005) ("The purpose of the Act is clearly to give conservation of fisheries priority over short-term economic interests."); *Daley*, 209 F.3d at 753 ("[U]nder the . . . [MSA], the Service must give priority to conservation measures."). Indeed, in the particular context of shark fishing, the amendments to the MSA addressing finning make the primacy of conservation unambiguous. *See* 16 U.S.C. § 1857(1)(P). This is,

accordingly, not the rare circumstance in which a state law interferes with a "deliberate effort to steer a middle path," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 378 (2000) (quotation marks omitted), or to strike a "careful balance," *Arizona*, 132 S. Ct. at 2505.

The MSA's provision for broad state-level participation in the implementation of the statutory objectives further undermines any inference of interference with Congress's method. *See, e.g.*, 16 U.S.C. § 1852(a)(2) ("Each [FMC] shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority."); *see also id.* § 1853(b)(3)(B) (permitting FMPs to limit commerce in fish caught within the EEZ "consistent with any applicable . . . State safety and quality requirements"); *id.* § 1856(a)(1) ("[N]othing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."); *Daley*, 209 F.3d at 749 ("The Fishery Act was enacted to establish a federal-regional partnership to manage fishery resources."). Courts have found conflicts between state and federal schemes with overlapping purposes when the federal scheme is comprehensive and exclusive, *see, e.g.*, *Arizona*, 132 S. Ct. at 2504-05 (immigration); *Crosby*, 530 U.S. at 380-88 (international sanctions), but not when, as here, the federal scheme is cooperative, *see Wyeth v. Levine*, 555 U.S. 555, 575 (2009) ("The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them." (alteration omitted)); *DeHart v. Town of Austin, Ind.*, 39 F.3d 718, 722 (7th Cir. 1994) ("[G]iven the clear

expressions of Congressional intent to foster cooperation with state and local governments and the different, albeit overlapping, purposes behind the [federal] Act and the . . . Ordinance, we discern no Congressional intent to ban state or local legislation . . . .").

## C.

The plaintiffs' attempt to draw a negative inference from Congress's failure in the MSA to address on-land activities related to finning, *see* 18 U.S.C. § 1857(1)(P) (referring to activities at sea, aboard fishing vessels, and during landing), is similarly meritless.  Silence, without more, does not preempt—"a clear and manifest purpose of pre-emption is always required." *Isla Petrol.*, 485 U.S. at 503 (quotation marks omitted).  There is no "authoritative federal determination" that on-land activities are "best left *un*regulated." *Id.*[7]  To the contrary, the federal scheme

---

[7] The plaintiffs rely on regulations that limit the circumstances under which sharks may be sold on land.  *See* 50 C.F.R. § 635.31(c)(1), (5).  But these regulations *limit*, rather than encourage, commerce in sharks.  *Cf.* 16 U.S.C. § 1853(b)(3) (permitting FMPs to "establish specified *limitations* which are necessary and appropriate for the conservation and management of the fishery on the . . . sale of fish caught during commercial, recreational, or charter fishing" (emphasis added)).  The plaintiffs also rely on a statement by Representative George Miller during floor debates on the federal finning prohibition act that the "Act will not prevent United States fishermen from harvesting sharks, bringing them to shore, and then using the fins or any other part of the shark."  146 Cong. Rec. H11571 (Oct. 30, 2000).  But a lone statement in the legislative history is not a "clear and manifest" expression of Congress's intent to preempt, and in any event, this statement merely describes the limits of federal law.

expressly preserves the ability of states to regulate fishing-related activities within their boundaries.  *See* 16 U.S.C. § 1856(a)(1).

**D.**

The plaintiffs amended their original complaint after we remanded the case upon affirming the denial of a preliminary injunction.  At the hearing on the motion to dismiss the amended complaint, the district court asked plaintiffs' counsel during the discussion of the preemption claim whether "you've got the complaint where you want it," and counsel responded affirmatively.  Based on this representation, the court found that a second round of amendments would be futile and granted the motion to dismiss with prejudice.

The plaintiffs assert for the first time on appeal that they could plead additional facts to support the preemption claim, and ask us to find that the district court abused its discretion in failing to grant leave sua sponte.  Even making the charitable assumption that this argument was preserved for appeal, *see Alaska v. United States*, 201 F.3d 1154, 1163-64 (9th Cir. 2000) ("Where a party does not ask the district court for leave to amend, the request on appeal to remand with instructions to permit amendment comes too late." (alterations and quotation marks omitted)); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) (relying on *Alaska* for the proposition that "we generally will not remand with instructions to grant leave to amend unless the plaintiff sought leave to

amend below"), we cannot conclude on this record that the district court abused its discretion in dismissing with prejudice.[8]

"Although leave to amend 'shall be freely given when justice so requires,' it may be denied if the proposed amendment either lacks merit or would not serve any purpose because to grant it would be futile in saving the plaintiff's suit." *Universal Mortg. Co. v. Prudential Ins. Co.*, 799 F.2d 458, 459 (9th Cir. 1986) (quoting Fed. R. Civ. P. 15(a)). The first amended complaint makes no allegations of a direct conflict between the California statute and any unambiguous federal mandate. At oral argument on this appeal, plaintiffs' counsel asserted that the plaintiffs could remedy this defect by alleging that state bans on commerce in shark fins affect the ability of commercial fishers to reap the optimum yields prescribed in FMPs for shark harvests. But the MSA does not preempt a state law simply because it may affect the realization of optimum yields—if that were so, a wide array of state regulations affecting commercial fishing, such as taxes or labor laws, would be potentially suspect. Indeed, Congress expressly foreclosed any interpretation of optimum yield that would have such a broad preemptive effect by

---

[8] The dissent correctly notes the "strong showing" required in the district court to justify dismissal with prejudice, but ignores the deferential abuse-of-discretion standard governing our review of the district court's failure to grant leave to amend. At the very least, it is even more difficult to perceive an abuse of discretion when the plaintiffs never sought leave to amend below.

preserving state jurisdiction over commerce in fish products within state borders.  *See* 16 U.S.C. § 1856(a)(1).

The plaintiffs concede that no provision of federal law affirmatively guarantees the right to use or sell shark fins onshore, and they do not dispute that there are commercially viable uses for sharks besides their detached fins.  That resolves the preemption issue.  *See Fla. Lime*, 373 U.S. at 146-47 ("[W]e are not to conclude that Congress legislated the ouster of this California statute . . . in the absence of an unambiguous congressional mandate to that effect.").  Leave to amend would therefore be futile. *Cf. ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 761-62 (9th Cir. 2014) ("Preemption is almost always a legal question, the resolution of which is rarely aided by development of a more complete factual record." (quotation marks omitted)).[9]

## IV.

"The Supreme Court has adopted a two-tiered approach to analyzing state economic regulation under the

---

[9] Our conclusion is bolstered by the posture in which the request to amend was made.  The original complaint was filed three years ago, since then, there has been ample opportunity to explore the scope of the preemption claim, including in litigating the preliminary injunction and the appeal from the denial of the preliminary injunction.  The plaintiffs had the benefit of this litigation, and its resolution, before filing the first amended complaint.  *Cf. AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953-54 (9th Cir. 2006) (affirming denial of leave to amend based on delay between learning of basis for amendment and seeking leave).

Commerce Clause." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948 (9th Cir. 2013) (quotation marks omitted), *cert. denied*, 135 S. Ct. 398 (2014). If a state statute "directly regulates or discriminates against interstate commerce, or . . . its effect is to favor in-state economic interests over out-of-state interests," it is "struck down . . . without further inquiry." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). When, however, a state statute has only indirect effects on interstate commerce and regulates evenhandedly, it violates the Commerce Clause only if "the burdens of the statute so outweigh the putative benefits as to make the statute unreasonable or irrational." *UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1196 (9th Cir. 2007) (alteration omitted).

## A.

The plaintiffs claim the Shark Fin Law is per se invalid under the Commerce Clause because it regulates extraterritorially by curbing commerce in shark fins between California and out-of-state destinations, and by preventing the flow of shark fins through California from one out-of-state destination to another. But a state may regulate commercial relationships "in which at least one party is located in California." *Gravquick A/S v. Trimble Navigation Int'l, Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003). And even when state law has significant extraterritorial effects, it passes Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct. *See Rocky Mtn. Farmers Union v. Corey*, 730 F.3d 1070, 1101-04 (9th Cir. 2013) (upholding California statute imposing fuel standards that affect out-of-state fuel producers because the standard applies only to fuels consumed in California), *cert. denied*, 134 S. Ct. 2875

(2014); *Ass'n des Eleveurs*, 729 F.3d at 948-51 (upholding California statute banning sale of products from force-fed birds, even though it affected out-of-state producers and exports from California); *cf. Sam Francis Found. v. Christies*, 784 F.3d 1320, 1323-24 (9th Cir. 2015) (en banc) (invalidating a California statute that "facially regulates a commercial transaction that takes place wholly outside of the State's borders" (quotation marks omitted)).   Thus, nothing about the extraterritorial reach of the Shark Fin Law renders it per se invalid.

The plaintiffs' reliance on *Healy v. Beer Institute*, *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, and *Baldwin v. G.A.F. Seelig, Inc.* is misplaced. In each of those cases, the Supreme Court struck down price-control or price-affirmation statutes that had the effect of preventing producers from pricing products independently in neighboring states. *See Healy*, 491 U.S. 324, 326, 334 (1989) (Connecticut statute requiring beer distributors to affirm that Connecticut prices were at least as low as prices in other states); *Brown-Forman*, 476 U.S. at 575, 582-83 (New York statutes barring distillers from selling liquor at prices higher than prices in other states); *Baldwin*, 294 U.S. 519, 521-22 (1935) (New York statute prohibiting sale of milk in New York if acquired from Vermont farmers at price lower than price available to New York farmers).   We have recognized the sui generis effect on interstate commerce of such price-control regimes and the correspondingly limited scope of these cases. *See Ass'n des Eleveurs*, 729 F.3d at 951 ("*Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product and does not tie the price of its in-state products to out-of-state prices." (alteration and quotation marks omitted) (quoting *Walsh*, 538 U.S. at 669)).   The Shark Fin

Law does not fix prices in other states, require those states to adopt California standards, or attempt to regulate transactions conducted wholly out of state, and the price-control cases are therefore inapposite. *See Rocky Mtn.*, 730 F.3d at 1102-03.

## B.

The plaintiffs claim that even if the Shark Fin Law is not an impermissible direct regulation of extraterritorial conduct, it should be struck down under *Pike v. Bruce Church, Inc.*, because "the burden [it] impose[s] on [interstate] commerce is clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970). Our precedents, however, preclude any judicial "assessment of the benefits of [a state] law[] and the . . . wisdom in adopting" it unless the state statute either discriminates in favor of in-state commerce or imposes a "significant burden on interstate commerce." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1156 (9th Cir. 2012); *see also Ass'n des Eleveurs*, 729 F.3d at 951-52. Here, the plaintiffs do not allege the Shark Fin Law has any discriminatory effect, and they cannot establish a significant burden on interstate commerce.

"[O]nly a small number of . . . cases invalidating laws under the dormant Commerce Clause have involved laws that were genuinely nondiscriminatory . . . ." *Nat'l Ass'n of Optometrists*, 682 F.3d at 1150 (quotation marks omitted). These cases address state "regulation of activities that are inherently national or require a uniform system of regulation," *id.* at 1148—most typically, interstate transportation, *see, e.g.*, *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 447-48 (1978) (state regulation of truck length); *see also Ass'n des Eleveurs*, 729 F.3d at 952

("[E]xamples of courts finding uniformity necessary fall into the categories of transportation or professional sports leagues." (alteration and quotation marks omitted)).

The Shark Fin Law does not interfere with activity that is inherently national or that requires a uniform system of regulation.  The purpose of the Shark Fin Law is to conserve state resources, prevent animal cruelty, and protect wildlife and public health.  *See* 2011 Cal. Legis. Serv. ch. 524, § 1 (A.B. 376) (listing purposes).  These are legitimate matters of local concern.  *See, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978, 986 (9th Cir. 2008); *UFO Chuting*, 508 F.3d at 1196.  And to the extent the Shark Fin Law is effectively a means of ocean fishery management, fishery management is an inherently cooperative endeavor—with state and federal jurisdiction over the oceans divided according to distance from shore, *see* 16 U.S.C. §§ 1802(11), 1811(a), 1856(a)(1), and with state and federal cooperation contemplated even in the management of federal waters, *see, e.g.*, *id.* § 1852(a)(2).  There is, accordingly, no significant interference with interstate commerce.  *See Ass'n des Eleveurs*, 729 F.3d at 952; *Nat'l Ass'n of Optometrists*, 682 F.3d at 1156.

"Because the [Shark Fin Law does] not impose a significant burden on interstate commerce, it would be inappropriate for us to determine [its] constitutionality . . . based on our assessment of the benefits of th[e] law[] and the State's wisdom in adopting [it]," or the availability of less-burdensome alternatives.  *Nat'l Ass'n of Optometrists*, 682 F.3d at 1156-57; *see also Ass'n des Eleveurs*, 729 F.3d

at 952 (finding an inquiry into "whether the benefits of the challenged laws are illusory" unwarranted because the regulation of the foie gras market is not inherently national).[10]

## V.

We **AFFIRM** the judgment of the district court.

---

[10] Because none of the plaintiffs' constitutional claims survive the motion to dismiss, the district court properly dismissed the claim under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

REINHARDT, Circuit Judge, dissenting in part:

I dissent in part because the plaintiffs must be granted leave to amend the complaint with respect to their preemption claim.[1] "[I]n a line of cases stretching back nearly 50 [now 65] years, we have held that in dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend *even if no request to amend the pleading was made*, unless it determines that the pleading *could not possibly be cured* by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (emphasis added) (citations omitted); *see also Sharkey v. O'Neal*, 778 F.3d 767, 774 (9th Cir. 2015). In my view, the defects in plaintiffs' preemption claim *could* be cured by amendment, and the majority's other suggested reasons for affirming the denial of leave to amend are also without merit.

The majority first states in dictum that the issue of the denial of leave to amend the complaint may have been waived. As the foregoing statement of the law regarding dismissals with prejudice makes clear, however, whether the plaintiffs asked the district court for leave to amend is irrelevant. The majority incorrectly suggests that *Alaska v. United States*, 201 F.3d 1154, 1163–64 (9th Cir. 2000), broadly held that a party cannot raise the issue for the first time on appeal, Maj. Op. at 15-16, but that case neither considered nor abrogated our longstanding rule regarding dismissals under Rule 12(b)(6). Rather, it merely held that

---

[1] The plaintiffs do not contest the denial of leave to amend with respect to their Commerce Clause claim on this appeal.

the government could not seek to amend its *answer* to the complaint on appeal from judgment on the pleadings where it had intentionally adopted its *answer* as a strategic litigating position. *See Alaska*, 201 F.3d at 1163. In so doing, *Alaska* relied on cases holding that a party cannot wait until an appeal of *summary judgment* to seek leave to amend a pleading, *id*. at 1163–64—a rule that makes sense in light of the time and expense that a disposition at that stage entails. By contrast, there is a strong presumption that a plaintiff with a plausible legal claim who simply fails to master the art of the well-pleaded complaint must be allowed to cure pleading defects—whether or not it makes a request to do so before the district court.

The majority also alludes in dictum to the fact that the plaintiffs voluntarily amended their complaint on one prior occasion and that it has been three years since the original complaint was filed. True, the presumption that a dismissal should be without prejudice may be rebutted by a finding of "undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party by virtue of allowance of the amendment . . . ." *Sharkey*, 778 F.3d at 774 (internal citation and quotations marks omitted). However, absent prejudice to the opposing party—which the district court did not find and the defendants do not assert—there must be a "*strong* showing" of one of the other factors to justify a dismissal with prejudice. *Id*. (emphasis added and citation omitted). A single, good-faith prior amendment of the complaint cannot satisfy this high bar. Nor can the mere passage of

time.**2** More important, the district court relied solely on the purported futility of an amendment. We cannot affirm based on a finding of repeated failure to cure or undue delay that the district court did not make. *See id*. (holding that the district court must provide an explanation for dismissal with prejudice).

Nor are the majority and the district court correct that the plaintiffs' pleading defects could not possibly be cured by amendment. I agree that the plaintiffs' complaint as currently drafted fails to "identify any actual conflict between" the Shark Fin Law and "the federal government's authority under the [Magnuson-Stevens Act] to manage shark fishing in the [exclusive economic zone]." Maj. Op. at 10 (quotation marks omitted). It includes nothing beyond "mere conclusory statements," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), that the Shark Fin Law conflicts with "the [Magnuson-Stevens Act], federal implementing regulations and federal [Fisheries Management Plans]." First Amended Complaint for Declaratory and Injunctive Relief at 12 ¶ 57, *Chinatown Neighborhood Ass'n v. Harris*, No. CV 12-03759 WHO (N.D. Cal. Dec. 9, 2013). However, the

---

**2** This case is not akin to *AmerisourceBergen Corp. v. Dialysist W., Inc.*, cited by the majority, in which the district court found that the defendant would be prejudiced by the plaintiff's attempt "twelve months into the litigation, . . . [to] drastically change[ ] its litigation theory" without explanation. 465 F.3d 946, 953 (9th Cir. 2006). As explained below, the problem with the operative complaint in this case could be cured by the pleading of additional facts; unlike in *AmerisourceBergen*, the plaintiffs do not seek to change their strategy altogether.

plaintiffs assert that, if permitted to amend the complaint, they could plead additional facts demonstrating that (1) the federal government has adopted specific quotas for shark fishing pursuant to the optimum yield provisions of the Magnuson-Stevens Act and that (2) the Shark Fin Law poses an obstacle to achievement of those quotas because it significantly reduces otherwise legal shark fishing.[3] As outlined below, if such facts were properly pleaded, this would constitute a plausible claim for relief.

As relevant here, conflict preemption occurs where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012), including where it "would interfere with the careful balance struck by Congress," *id*. at 2505. A central purpose and objective of the Magnuson-Stevens Act is to "achieve and maintain, on a continuing basis, the optimum yield from each fishery," 16 U.S.C. § 1801(b)(4), which is the "amount of fish which — (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; [and] (B) is prescribed on the basis of the maximum sustainable yield from the fishery . . . ." *Id*. § 1802(33). As the majority explains, the Magnuson-Stevens Act creates a framework under which regional

---

[3] Federal law bans the inhumane *practice* of shark finning—of removing the fin from a shark on a boat—but it does not prohibit the landing of an intact shark carcass or the subsequent detachment and sale of a fin. *See* 16 U.S.C. § 1857(1)(P).

Fishery Management Councils comprised of federal and state stakeholders collaborate to adopt Fishery Management Plans designed to achieve optimum yield. *Id*. § 1851(a). In short, Fishery Management Plans seek to maximize the commercial and recreational benefits of fisheries in the exclusive economic zone without compromising the long-term sustainability of them. *See id*.; *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000).

One of the things a Fishery Management Plan may do to achieve optimum yield is establish a quota for the amount of a particular species of fish that should be caught. A plaintiff states a cognizable preemption claim where a Fishery Management Plan has established such a quota and a state law interferes with the achievement of that quota. *Se. Fisheries Ass'n v. Chiles*, 979 F.2d 1504, 1510 (11th Cir. 1992) (holding that the plaintiffs stated a cognizable preemption claim where a Fishery Management Plan established an annual quota for the total catch of Spanish Mackerel while state law established a daily limit on the number of Spanish Mackerel that a commercial vessel could bring into a state port). Notwithstanding the majority's statement to the contrary, the Magnuson-Stevens Act provision that preserves a state's "jurisdiction or authority . . . *within its boundaries*," 16 U.S.C. § 1856(a)(1) (emphasis added), does not authorize a state to adopt laws that pose an obstacle to the federal government's authority to manage and maximize the productivity of fisheries within *its own respective territory*, *see id*. § 1811(a) ("the United States claims, and will exercise . . . sovereign rights and exclusive fishery management authority over all fish . . . within the exclusive economic zone."). *See also City of Charleston v. A Fisherman's Best*, 310 F.3d 155, 174–76, 179 (4th Cir. 2002) (holding that city resolution banning

vessels that use longline tackle from docking at city marina was preempted by Fishery Management Plan designating "longline" as the authorized gear for catching swordfish).

Although the plaintiffs' pleadings as presently drafted fail to point to a Fishery Management Plan regulating sharks or setting a shark quota, at oral argument defendants and their amicus curiae admitted that there are a number of Fishery Management Plans in place around the country that do so. Even if those Fishery Management Plans are silent with regard to the sale of shark *fins* (as the defendants and their amici represented at oral argument), the plaintiffs could establish that the Shark Fin Law is preempted by adducing clear evidence that it poses an obstacle to the achievement of an optimum yield of sharks specified in an Fishery Management Plan because it results in a significant decrease in otherwise legal shark fishing. The plaintiffs asserted at oral argument that if permitted to amend their complaint, they would provide additional facts demonstrating that the number of sharks caught in the exclusive economic zone has dropped significantly and that they have lost millions in revenue due to the Shark Fin Law.[4] If the fin is the main part of a shark that has

---

[4] The plaintiffs did not, as the majority contends, concede that "there are commercially viable uses for sharks besides their detached fins." Maj. Op. at 17. The majority improperly relies on two statements in the record to hold that the plaintiffs conceded the matter. First, it cites plaintiffs' counsel's statement at oral argument that a letter from the Director of the California Department of Fish and Wildlife was not a "big deal." That letter states that "revenue from the sale of sharks harvested in federal waters off California derives mostly from the sale

commercial value and thus California fishermen largely cease catching sharks in exclusive economic zone fisheries, the federal objective of achieving optimum yield might be unconstitutionally impaired by the state's ban on the sale of fins—i.e., the balance between conservation and economic interests struck by the Fishery Management Council in adopting a quota could be upset. While I express no opinion on the likelihood that such a claim would ultimately succeed on the merits, the command that "leave to amend shall be freely given" requires that the plaintiffs at least be given a chance to adequately plead their claim. *Sharkey*, 778 F.3d at 774 (citation omitted).

Finally, the majority's assertion that in dismissing the complaint with prejudice the district court properly relied on a representation by the plaintiffs that amendment would be futile is erroneous. The comment on which the majority and the district court rely is ambiguous at best. In response to the district court's inquiry, "you've got the complaint

---

of the meat of the shark, not from the sale of fins after the shark is legally harvested and landed with fins naturally attached." Although that assertion may indeed prove true, our job at the motion to dismiss stage is to test the sufficiency of the *plaintiffs'* allegations. We cannot simply accept as true a state government official's position regarding a factual matter.

Second, the majority relies on a footnote in the operative complaint stating that "[t]he use of approximately 95% of any legally fished shark . . . is still permitted." This statement, however, says nothing about the relative commercial value of the parts of a shark or whether the ban on the sale of sharks is an obstacle to the achievement of optimum yield— matters that involve factual questions that cannot be decided against the plaintiffs at the motion to dismiss stage.

where you want it . . . ?", plaintiffs' counsel responded "you are correct." Counsel likely meant only that he believed that he had made sufficient averments to support the claims at the motion to dismiss stage, as the district court's inquiry followed counsel's lengthy argument to that effect. This is different from a representation that should the district court conclude that the allegations in the complaint were insufficient, the plaintiffs could not provide further allegations. The district court and the majority err by treating counsel's ambiguous representation as sufficient to dislodge "the presumption in favor of granting leave to amend." *Id*. It would have taken little effort by the district court to clarify the matter before permanently depriving the plaintiffs of an opportunity to pursue their case.

I respectfully dissent.